**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JULIA TAYLOR,<br><br>               Plaintiff,<br><br>   vs.<br><br>RENOWN HEALTH, a Nevada corporation,<br><br>               Defendant. | 3:13-cv-00185-RCJ-WGC<br><br>**ORDER** |

This case arises out of Renown Health's ("Renown") alleged violation of the Americans with Disabilities Act ("ADA" or "the Act"). Pending before the Court is Renown's Motion for Summary Judgment (ECF No. 24). Plaintiff Taylor has filed a Response (ECF No. 33) and Renown submitted a Reply (ECF No. 41). For the reasons contained herein, Renown's motion is GRANTED.

**I.     BACKGROUND**

Taylor is a Certified Nurse's Assistant ("CNA") and has worked as a CNA for a number of years. (Taylor Dep. 41:21–42:24, ECF No. 24-2, Ex. 9). In 2012, Taylor applied for a CNA position in Renown's Telemetry 7 Unit. This Unit deals with patients that have heart conditions and who are obese or morbidly obese. (Kamiah Taylor Decl. ¶ 3, ECF No. 24-1, Ex. 2). Patients in the Telemetry 7 Unit are categorized by the number of CNAs needed to help them stand or ambulate. (*Id.* ¶ 4). While some patients are able to stand by themselves ("Up-Self"), others

1

require assistance to move around ("Up-Standby"). Other patients are able to get up and move around safely only with the assistance of a CNA, or potentially two or three CNAs ("Up x1," "Up x2," or "Up x3"). (*Id.*). Even patients who appear to be able to walk on their own are often accompanied by a CNA to provide support should the patient unexpectedly lose his or her balance or fall. (*Id.* ¶ 5). Patients also occasionally become angry and combative, requiring the CNAs to restrain and control the patient lest the patient injure himself or herself and others. (*Id.* ¶ 8). CNAs in this Unit are assigned approximately nine to twelve patients per shift. (*Id.* ¶ 5).

Renown's CNA "Position Description" states that during a normal workday a CNA should expect to spend 10% of his or her time lifting things and that a CNA is frequently required to lift up to 35 pounds and occasionally must lift up to 100 pounds. (Position Description 1–2, ECF No. 24-1, Ex. 7). Renown lists the ability to "correctly perform manual tasks" as an "[e]ssential function[]" of its CNAs. (*Id.* at 2). The Description further states that a CNA "[m]ust be able to transport, transfer, and/or lift patients weighing up to 350 pounds with assistance." (*Id.*).

Taylor was interviewed and received an offer of employment in the Telemetry 7 Unit "contingent upon Renown Health's receipt of satisfactory results from a pre-employment drug screen, a pre-employment medical examination, employment verification, and a criminal background check." (Offer Letter, ECF No. 33-1). Taylor was directed to contact "Occupational Health" to set up the medical exam. (*Id.*). The purpose of the medical examination was to verify that Taylor was physically fit to carry out her duties as a CNA at Renown. (Gasparre Decl. ¶ 3, ECF No. 24-2, Ex. 11). The examination was conducted by Dr. Richard Gasparre during which he asked Taylor to "perform physical tasks such as raising her arms while [he] applied resistance." (*Id.*). Prior to the examination, Taylor disclosed to Dr. Gasparre that she had limited

movement in her left shoulder, and, indeed, Dr. Gasparre found that Taylor's "upper left extremities were not within normal limits" and that she possessed "limited arm strength." (*Id.*). Based on these tests, Dr. Gasparre determined that Taylor "is unable to lift her left arm above chest-level, cannot perform overhead activity on her left side, and should restrict her overall lifting to 50 pounds." (*Id.* ¶ 7; *see also* Physical Report, ECF No. 24-2, Ex. 12, at 41). He informed Renown of his findings, but indicated that Taylor might be able to perform the job with accommodation. (*Id.* ¶ 6). After reviewing Dr. Gasparre's report on Taylor's physical condition, Renown's Human Resources ("HR") Department concluded that Taylor would not be able to perform functions essential to the job. (Mendoza Decl. ¶ 4). Thereafter, Danny Mendoza, a Recruiter in Renown's HR Department, informed Taylor that Renown could not hire her because it believed that her physical limitations would impair her ability to perform essential functions of a CNA in the Telemetry 7 Unit.

When Renown refused to hire her, Taylor secured employment as a "Float Pool" CNA with St. Mary's Regional Medical Center. Shortly thereafter, Taylor filed this lawsuit against Renown alleging that Renown violated the ADA. Taylor argues that she suffered disparate treatment because Renown refused to hire her due to her disability. Taylor's First Amended Complaint ("FAC") additionally claims that Renown committed a technical violation of the ADA because its offer was contingent not only on a medical examination but also upon a drug screen and criminal background check. (FAC ¶ 22, ECF No. 19). Renown moves for summary judgment on both of these claims.

**II.   LEGAL STANDARD**

A principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A

3

court grants summary judgment only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Rather, only genuine issues of *material* facts are relevant to the summary judgment analysis. A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "The moving party bears the initial burden of establishing the absence of a genuine issue of material fact." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). The burden is met by demonstrating to the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. This is done by citing to depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1)(A). Once the initial burden is met, however, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial." *Fairbank*, 212 F.3d at 531.

Moreover, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. Conversely, where reasonable minds could differ on the facts

proffered in support of a claim, summary judgment should not be granted. *Petzak v. Nevada ex rel. Dep't of Corr.*, 579 F. Supp. 2d 1330, 1333 (D. Nev. 2008). "Summary judgment is inappropriate if reasonable jurors . . . could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

**III.    DISCUSSION**

    **A.  Disparate Treatment**

The ADA prohibits discriminating against an individual "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). A disparate-treatment claim is cognizable under the ADA. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003); *see also* 42 U.S.C. § 12112(b)(3) (defining "discriminate" to include "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability"). When evaluating a claim of disparate treatment on summary judgment under the ADA, the court applies the *McDonnell Douglas* burden-shifting analysis. *Raytheon Co.*, 540 U.S. at 49 n.3 (2003); *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001). This analysis requires first that the plaintiff demonstrate a prima facie case of discrimination under the ADA. *See Snead*, 237 F.3d at 1093. If the plaintiff establishes the prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer successfully demonstrates that the employment action was not based on the employee's disability, the burden shifts back to the plaintiff to show that the employer's proffered reason is mere pretext for discrimination. *Id.*

To establish a prima facie case of discrimination under the ADA, Taylor must show that (1) she is "disabled" within the meaning of the Act; (2) she is a "qualified individual" within the meaning of the Act; and (3) that she suffered an adverse employment action because of her disability. *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1229 (9th Cir. 2003).

### 1. "Disability" Under the ADA

To satisfy the first prong of the prima facie case that Renown discriminated against her in violation of the ADA, Taylor must demonstrate that she has a "disability." *Id.* Disability is defined by the Act as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment, or; (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Taylor claims that she is not actually disabled, but rather that Renown regarded her as disabled when it revoked its offer of employment. (*See* FAC ¶ 18).[1] Accordingly, subsection (C) is the only part of the definition that is relevant to this action.

In 2008, Congress amended the ADA to broaden the Act's coverage by relaxing the standards by which a plaintiff must show that he or she has a disability. *See Weaving v. City of Hillsboro*, 763 F.3d 1106, 1112 (9th Cir. 2014). The Americans with Disabilities Act Amendments Act ("ADAAA"), which became effective on January 1, 2009, expanded the "regarded as" prong of the ADA to not only cover individuals who are perceived as having an impairment that substantially limits a major life activity, *see* 42 U.S.C. § 12102(1)(A), but also to

---

[1] Taylor's asserts two claims for relief in her FAC, and the FAC is somewhat vague regarding the legal theories on which these claims are based. Taylor alleges that "she has a disability," yet argues that Renown discriminated against her with respect to her employment only "because it *regarded* her as disabled." (FAC ¶¶ 12, 18) (emphasis added). The parties appear to be in agreement that Taylor's case asserts only that she was "regarded as" disabled and not that she is actually disabled. (*See* Def.'s Mot. to Dismiss 14–15, ECF No. 24; Pl.'s Opp'n 3, ECF No. 33; *see also* Correspondence between Counsel, ECF No. 24-2, Ex. 16 (acknowledging that Taylor is not alleging that she is disabled since she claims she could have performed as a CNA at Renown without accommodation)). The Court, therefore, finds that this case raises only a "regarded as" claim. *See Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1231 (9th Cir. 2003) (finding that plaintiff sought relief under the ADA "as an individual who was 'regarded as' having a disability, not as someone who is actually disabled").

cover individuals who are subjected to disparate treatment "because of an actual or perceived physical or mental impairment *whether or not* the impairment limits or is perceived to limit a major life activity, 42 U.S.C. § 12102(3)(A) (emphasis added). By proceeding under the "regarded as" prong of the ADA's disability definition, a plaintiff is not required to make "a showing of an impairment that substantially limits a major life activity or a record of such an impairment." 29 C.F.R. § 1630.2(g)(3). Moreover, an individual is "regarded as having such an impairment" if an employer refuses to hire the individual because of a perceived physical impairment, "whether or not that impairment . . . is perceived to substantially limit a major life activity." *Id.* § 1630.2(l)(1).

In this case, Taylor easily shows that she has a "disability" under the ADAAA. The expanded definition under the "regarded as" prong includes individuals who are perceived as having a physical impairment even if that perceived impairment would not limit a major life activity. *See* 42 U.S.C. § 12102(3)(A). Dr. Gasparre's findings indicated that Taylor's shoulder condition restricted her ability to lift more than 50 pounds. Based on this report, Renown perceived that Taylor had a physical impairment. This perception was the reason that Renown did not hire Taylor. (Mendoza Decl. ¶ 4). Taylor, thus, has shown that she has a disability within the definition of the ADA as amended by the ADAAA. Therefore, Taylor satisfies the first prong of a prima facie case of disability discrimination.

### 2. "Qualified Individual" Under the ADA

The next prong of the prima facie case requires Taylor to demonstrate that she is a "qualified individual." *See Dark v. Curry Cnty.*, 451 F.3d 1078, 1086 (9th Cir. 2006) (stating that the plaintiff bears the burden of establishing that she is a qualified individual within the meaning of the Act). A "qualified individual" under the ADA is "an individual who, with or without

reasonable accommodation, can perform the essential functions of the employment position that such individual . . . desires." 42 U.S.C. § 12111(8).  As a matter of law, "there is no duty to accommodate an employee in an 'as regarded' case." *Kaplan*, 323 F.3d at 1233.  Therefore, the relevant query in the present action is whether Taylor can perform the essential functions of a CNA in Renown's Telemetry 7 Unit without accommodation.

"Essential functions are the 'fundamental job duties of the employment position,' and do not 'include the marginal functions of the position." *Dark*, 451 F.3d at 1087 (quoting 29 C.F.R. § 1630.2(n)(1)).  Evidence of whether a particular function is essential includes:

> The employer's judgment as to which functions are essential; [w]ritten job descriptions prepared before advertising or interviewing applicants of the job; [t]he amount of time spent on the job performing the function; [t]he consequences of not requiring the incumbent to perform the function; . . . [t]he work experience of past incumbents in the job; and/or [t]he current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).  Renown's judgment as to the functions essential to a CNA position in its Telemetry 7 Unit clearly encompasses the ability to lift more than 50 pounds.  Prior to extending the contingency offer to Taylor, Renown conducted multiple interviews and evaluated her credentials.  (Mendoza Decl. ¶ 3).  The outcome of this process was that Renown found Taylor to be both qualified and competent to work as a CNA and that Renown wanted to hire her.  Renown then drafted the offer letter and explained that Taylor would be hired pending the outcome of the physical examination.  The fact that Renown ultimately determined that it could not hire Taylor because she cannot lift more than 50 pounds is evidence that, in Renown's judgment, this function is essential.

The written job description in this case also indicates that lifting is an essential function of a CNA's position.  The Position Description clearly states that a Renown CNA frequently must lift up to 35 pounds and occasionally must lift up to 100 pounds.  Renown further

8

highlighted this expectation by advising that a CNA must be able to assist in lifting patients who weigh up to 350 pounds. This is particularly relevant to the Telemetry 7 Unit given that many of their patients are either obese or morbidly obese. Moreover, in the "essential functions" portion of the Position Description, Renown makes it clear that CNAs are expected to carry out their "manual tasks." The amount of time that a CNA in the Telemetry 7 Unit spends lifting and supporting patients further indicates that the ability to lift more than 50 pounds is an essential function of the position. The Position Description states that 10% of a CNA's time is spent lifting, with 67% of that allocated to lifting up to 35 pounds and 33% of it allocated to lifting more than 50 pounds. However, CNAs currently employed by Renown in this Unit state that they are required to lift these amounts more frequently. (*See* Kamiah Taylor Decl. ¶ 7; Saenz Decl. ¶ 5, ECF No. 24-1, Ex. 5; Shalayeva Decl. ¶ 3, ECF No. 24-1, Ex. 6). The requirement to lift and help patients ambulate is an "everyday dut[y] of the position" and patients often lose their balance unexpectedly, which requires the accompanying CNA to lend immediate support. (Shalayeva Decl. ¶¶ 3–4).

There are a number of negative consequences that could arise if a CNA in the Telemetry 7 Unit has limited capacity to lift over 50 pounds. The CNA's ability to assist patients in moving and walking around would be limited. Although Taylor might be able to assist the "Up-Self" and the "Up-Standby" patients, she would likely struggle with the "Up x1" patients. It is also possible that she would be unable to provide the necessary support for an "Up x2" or "Up x3" patient, which might mean that additional CNAs are needed to assist these types of patients thereby taking CNAs away from other patients to compensate for Taylor's limitations. Moreover, if either an "Up-Self" or an "Up-Standby" patient unexpectedly lost his or her balance and needed immediate support or assistance, Taylor's physical limitations could prevent her

from effectively assisting the individual.  Ultimately, the patient might fall and become injured because Taylor could not provide the required physical support.  Even if Taylor were able to initially support the patient, it is quite possible that by doing so, Taylor herself might receive injury or further damage her shoulder by forcing it to support weight beyond its capacity.  Further, patients can become combative without any warning, which requires the attending CNA to restrain the individual with physical strength.  (Shalayeva Dec. ¶¶ 5–6).  Inability to do so could result in injury to both the patient and Renown staff members.  Finally, Renown is well aware of Taylor's limitations, and it could expose itself to liability if a patient were injured because Taylor, as the assigned CNA, physically could not provide support in an emergency situation. *See Wickliffe v. Sunrise Hosp., Inc.*, 706 P.2d 1383, 1388 (Nev. 1985) (holding that "a hospital is required to employ that degree of skill and care expected of a reasonably competent hospital in the same or similar circumstances").

     The personal experiences of the nurses working in this Unit further show that lifting more than 50 pounds is an essential function of the position for which Taylor applied.  For example, one CNA in the Telemetry 7 Unit recalls "numerous occasions" when patients lost their balance and she was required to immediately provide support. (Kamiah Taylor Decl. ¶ 7).  On one occasion, a patient fainted in the shower and a lone CNA had to support the patient's "entire body weight to prevent him from falling again." (*Id.*).  Another CNA from the Unit was once assisting a heavy patient who believed that he could stand and walk by himself, but when he unexpectedly became dizzy and collapsed on her, she was required to support him and assist him to his chair. (Shalayeva Decl. ¶ 4).  Even the less memorable patients, those of average weight, often need help to get out of bed and the attending CNA must be able to lift more than 50 pounds to provide the required assistance. (Saenz Decl. ¶ 4).  However, because of the unique nature of

Renown's Telemetry 7 Unit, patients often weigh much more than average. In fact, one CNA from the Unit recalls a 450-pound patient who needed the help of four CNAs to move around. (*Id.*). Each CNA had to lift well over 50 pounds to provide even basic care to this patient.

The evidence in this case leads the Court to conclude that lifting over 50 pounds is an essential function of a CNA in Renown's Telemetry 7 Unit. Accordingly, Taylor has the burden to show that she could in fact carry out the essential function. *Dark*, 451 F.3d at 1086. Taylor concedes that her condition restricts her ability to lift over 50 pounds. (Pl.'s Resp. to Reqs. for Admis. 3, ECF No. 24-3, Ex. 13). She further admits that her condition restricts her ability to lift her left arm above shoulder-level, and she acknowledges that her pre-employment physical examination with Renown revealed that she cannot lift over 50 pounds. (*Id.*).

Nevertheless, Taylor argues that she is a qualified individual because her past and current employment as a CNA demonstrates that she is physically capable of performing all functions essential to a CNA position. The Court disagrees. While Taylor has worked as a CNA in the past and is currently working as a CNA, she offers no evidence that the position at Renown is comparable to her other CNA positions. For instance, prior to applying at Renown, Taylor worked at an assisted living center. (Taylor Dep. 53:4–7). The record does not indicate that Taylor's responsibilities there were as physically demanding as they would be in Renown's Telemetry 7 Unit. Taylor contends that she was told by a former co-worker that working for Renown was actually less demanding than the work required at the assisted living center. (*Id.* at 68:21). However, Taylor fails to create a genuine dispute of material fact because there is no evidence that this former co-worker has ever worked in the particular Unit for which Taylor applied.[2] The patients in Renown's Telemetry 7 Unit are required to ambulate as much as

---

[2] Taylor states that she thinks that her former co-worker was assigned to telemetry, but she is "not 100 percent sure." (Taylor Dep. 69:5). This type of speculation cannot overcome a motion for summary judgment. *See Nelson v. Pima*

possible due to their heart and weight conditions. This requires the CNAs in this Unit to provide constant monitoring and to be available to provide physical assistance at a moment's notice. Taylor does not demonstrate that she was ever required to perform this type of support for nine to twelve patients during a single shift while she worked at the assisted living center. Moreover, Taylor does not offer any evidence that her position as a "Float Pool" CNA with St. Mary's Regional Medical Center is as physically demanding as the position at Renown would be. Therefore, the Court finds that Taylor is not a qualified individual and cannot prove a prima facie case of discrimination under the ADA. Accordingly, Taylor's disparate treatment claim fails.

### B. Technical Violation of the ADA

Taylor alternatively argues that Renown violated the ADA by requiring her to take a medical examination prior to the completion of all non-medical components of the application process. Employers are allowed to make pre-employment inquiries into the ability of an applicant to perform job-related functions and may ask an applicant to demonstrate how the applicant will be able to perform those functions. *See* 42 U.S.C. § 12112(d)(2)(B); 29 C.F.R. § 1630.14(a). Once an employer makes an offer of employment, it may require the applicant to submit to a medical examination before the applicant begins his or her employment duties. *See* 42 U.S.C. § 12112(d)(3); 29 C.F.R. § 1630.14(b). The employer may even condition an offer of employment on the results of the examination if all entering employees in the same job category are subjected to such an examination regardless of disability. 29 C.F.R. § 1630.14(b). Here, it is undisputed that Renown offered Taylor employment as a CNA in its Telemetry 7 Unit contingent on her passing, among other things, a medical examination. (Offer Letter, ECF No. 33-1). And

---

*Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) (citation omitted) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

1 Taylor does not dispute that all entering CNAs are required to participate in the same exam to
2 demonstrate their ability to meet the physical demands of the job.

3 However, Taylor argues that the employment offer was not real because it was contingent
4 on both medical and non-medical conditions. To support this contention, Taylor cites to *Leonel*
5 *v. American Airlines, Inc.*, 400 F.3d 702 (9th Cir. 2005). In that case, three applicants applied to
6 be flight attendants with American Airlines. The applicants were given offers of employment
7 conditioned on the completion of background checks and medical examinations. *Id.* at 704–05.
8 Rather than conducting the background checks first, American Airlines sent the applicants to an
9 on-site medical examiner who discovered, after running blood tests, that the applicants had HIV.
10 *Id* at 706. The applicants never disclosed that they were HIV positive, even though inquiries
11 were made regarding their health. *Id.* Based on these results, American Airlines rescinded the
12 employment offers. The Ninth Circuit held that by conducting a medical exam prior to the
13 completion of all non-medical conditions, American Airlines failed to establish that the job
14 offers were "real." *Id.* at 708–09. The court stated that a job offer is real "if the employer has
15 evaluated all relevant non-medical information which it reasonably could have obtained and
16 analyzed prior to giving the offer." *Id.* at 708 (citation omitted). If a job offer is not real, then
17 requiring an employment entrance examination would violate the ADA. *See* 42 U.S.C.
18 § 12112(d)(3) (allowing an employment entrance medical examination only "after an offer of
19 employment has been made").

20 To avoid such a violation, the court explained that employers should apply a two-step
21 approach. First, the employer should verify that the applicant satisfies all non-medical
22 components of the application process. *Leonel*, 400 F.3d at 709. Once this is complete, the
23 employer may require a medical examination because, at that point, the employment offer truly
24

13

is contingent on the examination's outcome and not on any non-medical reason. *Id.* The court further explained that the purpose of the two-step method is to protect an applicant's privacy and "to enable applicants to determine whether they were 'rejected because of disability, or because of insufficient skills or experience or a bad report from a reference.'" *Id.* (citation omitted).

Here, although Taylor's employment offer was contingent on both medical and non-medical components, the Court concludes that the policies for finding a technical violation of the ADA as articulated in *Leonel* are inapplicable to the present case. Unlike the applicants in *Leonel* who were sent immediately to be medically examined, Renown placed the responsibility on Taylor to schedule the exam and complete the background check prior to her orientation. (Offer Letter 2). Also unlike the applicants in *Leonel* who did not disclose their HIV status, Taylor voluntarily told Dr. Gasparre, a Renown representative, that she had a shoulder condition that limited her movement. (Gasparre Decl. ¶ 4). Therefore, the privacy issues that concerned the *Leonel* court are less controlling here. Moreover, Mendoza made it clear that Taylor was not hired because the results of the medical examination led Renown to believe that she could not perform the essential functions of a CNA in the Telemetry 7 Unit. (Mendoza Decl. ¶ 4–5). Thus, Taylor could "easily discern" that she was "denied employment on medical grounds" and was able to raise a challenge to Renown's actions accordingly. *Leonel*, 400 F.3d at 709.

Nevertheless, even if the Court were to find that Renown technically violated the ADA by failing to complete all non-medical components of the application process before requiring Taylor's medical examination, there is no evidence that Taylor suffered any harm therefrom. The undisputed reason Taylor was not hired by Renown is because her shoulder condition restricts her ability to lift more than 50 pounds. The outcome of Taylor's medical examination would have been the same regardless of whether that examination took place after the

completion of all the non-medical components of Renown's hiring process.  Indeed, Renown's alleged technical violation of the ADA is not the cause of Taylor's claimed injury.  Taylor's offer would have been revoked even if the medical examination had been conducted after the background check and any other non-medical component had been completed.  Since the only harm that Taylor alleges here is the revocation of the conditional offer, (*see* Pl.'s Opp'n 6), Renown's alleged failure to comply with the two-step approach is not the cause of Taylor's injury.  In other words, Taylor's offer of employment as a CNA in Renown's Telemetry 7 Unit would have been revoked due to her lifting restrictions even if Renown had complied with the two-step process.  Thus, Taylor claims no damages for which Renown's alleged technical violation of the ADA is the cause.  Accordingly, Renown is not liable for requiring a medical examination prior to allegedly failing to issue a real offer of employment to Taylor.

Therefore, Renown's motion for summary judgment is GRANTED.

**CONCLUSION**

IT IS HEREBY ORDERED that Renown's Motion for Summary Judgment (ECF No. 24) is GRANTED.

IT IS SO ORDERED.

Dated: December 18, 2014

_____
ROBERT C. JONES
United States District Judge

15